IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| DANA HARPER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 3:17-cv-245 |
| | ) | |
| RUTHERFORD COUNTY, | ) | JUDGE CAMPBELL |
| TENNESSEE, and RUTHERFORD | ) | MAGISTRATE JUDGE |
| COUNTY SHERIFF'S OFFICE, | ) | FRENSLEY |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

Pending before the Court is Defendants' Motion for Summary Judgment. (Doc. No. 35). Plaintiff filed a response in opposition (Doc. No. 44), and Defendants' have replied. (Doc. No. 47). For the reasons discussed below, Defendants' Motion for Summary Judgment is **GRANTED.**

### I.  FACTUAL BACKGROUND

Dana Harper, ("Plaintiff") began work with the Rutherford County Sheriff's Office on March 5, 2012, as a deputy sheriff, working in a position referred to as "deputy jailer." (Doc. No. 45 ¶ 1). Deputy jailers typically make less money than a sheriff in the patrol division, also referred to as "patrol deputy." (*Id.* ¶ 2). In order to become a patrol deputy, a deputy jailer must: (1) graduate from the Tennessee Law Enforcement Training Academy ("TLETA") and (2) successfully complete field training program (sometimes referred to as "FTO", "FTO training", "field training", or "road training"). (*Id.* ¶ 3). Patrol deputies serve in a variety of capacities, including as security to the county courthouse, performing traffic stops and handling domestic assault issues. (*Id.* ¶¶ 3-4).

In 2014, Plaintiff was selected to attend TLETA and was advised upon his completion of the field training program he would be assigned to provide courthouse security. (*Id.* ¶¶ 5-6). Plaintiff started field training with the Sheriff's Office one week after completing TLETA. (*Id.* ¶ 11). The field training program requires officers participating to be exposed to various aspects of the duties of being a certified patrol officer. (*Id.* ¶ 15). Plaintiff completed ten weeks of field training when he was assigned to his field training rotation at the courthouse. (*Id.* ¶ 17). Plaintiff worked in the courthouse rotation for three months and was then rotated to road deputy to continue his training. (Doc. No. 48 ¶ 13). Due to Plaintiff's dyslexia, Plaintiff had significant difficulty completing his reports in a timely manner. (*Id*. ¶¶ 14-15). Plaintiff asked for additional time to complete reports, for assistive computer software, and to have other officers check his reports for errors. (*Id.* ¶ 16). Plaintiff did not complete the requisite training for patrol deputy and was reassigned to the jail as a deputy jailer, and his salary was reduced. (*Id.* ¶ 21).

Defendants gave Plaintiff a second attempt at field training, and Plaintiff disclosed to Defendants that he had dyslexia, after which he received an accommodation of assistive technology. (Doc. No. 45 ¶ 26; Doc. No. 48 ¶ 23). Ultimately, after given a second opportunity, Plaintiff was unable to successfully complete the field training program and was again reassigned to the jail. (Doc. No. 45 ¶ 27). Plaintiff's second attempt at completing the field training program ended with Plaintiff's actions during a traffic stop. (*Id.* ¶ 37). Plaintiff's field training supervisor, Corporal Mark Mack ("Corporal Mack'), informed Plaintiff he was only meeting minimum requirements due to mistakes in his reports, and that he failed his road training for having his hand on his firearm during a traffic stop and other actions. (Doc. No. 48 ¶¶ 24-25). Plaintiff's difficulty in writing his reports negatively affected his ability to complete his road training. (*Id.* ¶ 29). After his field training was suspended, Defendants informed Plaintiff he could resign or go back to work

at the jail, which resulted in a 12 percent reduction in pay. (*Id.* ¶¶ 30-31). After being reassigned to the jail for the second time, Plaintiff resigned and began working at the Vanderbilt Police Department. (*Id.* ¶ 32).

Plaintiff initially filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") in November 2015. (Doc. No. 1 ¶ 18). On February 2, 2017, Plaintiff filed a Complaint against Defendants alleging violations of the Americans with Disabilities Act ("ADA"). (Doc. No. 1). Plaintiff asserts Defendants discriminated against him as a result of his dyslexia by demoting him, not assigning him to work in the courthouse, and eventually constructively terminating him due to his disability. (*Id.* ¶ 28). Plaintiff also alleges Defendants failed to accommodate his disability and retaliated against him for asserting his rights under the ADA. (*Id.* ¶¶ 29, 34). Defendants argue summary judgment is appropriate because Plaintiff was not "otherwise qualified" to perform the essential functions of a patrol deputy, and Plaintiff voluntarily resigned his position with Defendants. (Doc. No 36).

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks,* 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the nonmoving party's case. *Id.*

In evaluating a motion for summary judgment, the court views the facts in the light most favorable for the nonmoving party, and draws all reasonable inferences in favor of the nonmoving party. *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 242 (6th Cir. 2015); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003). The Court does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Rather, the Court determines whether sufficient evidence has been presented to make the issue of material fact a proper jury question. *Id.* The mere scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary judgment; instead, there must be evidence of which the jury could reasonably find for the nonmoving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

### III. ANALYSIS

**A. ADA Discrimination**

The ADA provides, in relevant part, that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A plaintiff may prove that he was discriminated against based upon his disability either through direct[1] or indirect evidence. *Monette v. Electronic Data Sys. Corp.,* 90 F.3d 1173, 1178 (6th Cir. 1996).

---

[1] "Direct evidence is evidence that 'if believed, requires the conclusion that unlawful discrimination was at least a motivating factor' in the adverse employment action." *Erwin v. Potter,* 79 Fed. Appx. 893, 896 (6th Cir. 2003) (quoting *Bartlik v. U.S. Dep't of Labor,* 73 F.3d 100, 103 n. 5 (6th Cir. 1996)). "When an employer admits that it relied upon a disability in making an adverse employment decision an employee may establish a *prima facie* case of [direct] employment discrimination under the ADA. . ." *Hoskins v. Oakland County Sheriff's Dept.*, 227 F.3d 719, 724 (6th Cir. 2000) (citing *Hamlin v. Charter Township of Flint*,
...

When a plaintiff seeks to establish his case through indirect evidence, the *McDonnell Douglas* burden-shifting approach applies so that the

> plaintiff may establish a *prima facie* case of discrimination by showing that: (1) he or she is disabled; (2) otherwise qualified for the position, with or without reasonable accommodation; (3) suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. The defendant must then offer a legitimate explanation for its action. If the defendant satisfies this burden of production, the plaintiff must introduce evidence showing that the proffered explanation is pretextual. Under this scheme, the plaintiff retains the ultimate burden of persuasion at all times. *Id.* at 1186–87; *Walsh v. United Parcel Serv.,* 201 F.3d 718, 724–25 (6th Cir. 2000).

"The direct evidence and circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other, not both. If a plaintiff can produce direct evidence of discrimination that the *McDonnell Douglas* paradigm is of no consequence. Similarly, if a plaintiff attempts to prove its case use the *McDonnell Douglas* paradigm, then the party is not required to introduce direct evidence of discrimination." *Kline v. Tennessee Valley Auth.*, 128 F.3d 337 (6th Cir. 1997).

For Plaintiff's indirect evidence of disability discrimination, Defendant challenges the second and third prongs of Plaintiff's *prima facie* case of discrimination, that he is otherwise qualified, with or without reasonable accommodation and suffered an adverse employment action. (Doc. No. 36 at 9, 11-13). Thus, for the purposes of deciding Defendants' motion for summary judgment the Court will assume the other prongs of Plaintiff's prima facie case have been met.

---

165 F. 3d 426, 429 (6th Cir. 1999)). While Plaintiff's brief seems to assert direct evidence of discrimination, he provides no direct evidence of disability discrimination; Plaintiff provides no testimony that Defendants terminated or constructively discharged Plaintiff due to his dyslexia. Instead, Plaintiff's brief applies the direct discrimination *prima facie* elements to his case before presenting the Court with actual direct evidence of discrimination. *See Hoskins*, 227 F.3d at 724. Because Plaintiff does not present evidence of direct discrimination, the Court will assess Plaintiff's ADA discrimination claim on indirect evidence.

1. "Otherwise Qualified" for the Position of Patrol Deputy

The term 'qualified individual' means "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8) (2008). Essential functions are "fundamental job duties of the employment position the individual with a disability holds." 29 C.F.R. § 1630.2(n)(1) (2010). "[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential...." *Id.*

Plaintiff asserts he could have performed the duties of deputy officer assigned to courthouse security. (Doc. No. 44 at 5). Defendant argues Plaintiff was not qualified to perform the essential functions of patrol deputy assigned to courthouse security. (*Id.* at 9). Defendant asserts that in order for Plaintiff to work at the courthouse he had to complete first the field training program. (*Id.*). Plaintiff failed to complete the field training during his first attempt. (Doc. No. 45 ¶ 26; Doc. No 48 ¶ 22). Defendant argues that Plaintiff was unable to complete his second attempt at field training because he performed poorly during a traffic stop. (Doc. No. 36 at 9). Defendant argues that Plaintiff admits his dyslexia had nothing to do with his inability to drive safely, operate his equipment safely, have good presence and posture, nor his ability to use his hands properly during a traffic stop. (*Id.*; Doc. No. 45 ¶¶ 45-49). Defendant cites to one of Plaintiff's field training supervisors, Corporal Alford, who stated Plaintiff had major issues with his field training and advised Plaintiff that "he was not at a point that he could function as a solo officer." (Doc. No. 36 at 10; Doc. No. 38-1, Pl. Depo. Ex. 3). Corporal Alford also discussed Plaintiff not taking initiative and not making traffic stops, as well as Plaintiff's driving and performing in stressful situations. (*Id.*). Therefore, Plaintiff was not "otherwise qualified" for the position of patrol deputy because Plaintiff did not complete the requisite training.

Plaintiff responds by arguing he successfully performed the functions of courthouse security for approximately three months before being required to repeat road deputy training. (Doc. No 44 at 5). Plaintiff argues he was informed by Defendants that he would be assigned to "Court House Security," and after ten weeks of field training he was approved to work as a "solo officer" at the courthouse. (*Id.*).[2] Plaintiff argues he was capable of performing the essential functions for courthouse security and Defendants do not demonstrate how completion of the FTO training was essential to performing that job. (*Id.* at 6).

The term "essential functions" means "the fundamental job duties of the employment position the individual with a disability holds or desires," but it does not include only marginal functions. 29 C.F.R. § 1630.2(n)(1). The inquiry into whether a function is essential is highly fact specific. *See Brickers v. Cleveland Bd. of Educ.,* 145 F.3d 846, 849 (6th Cir.1998); *Hall v. United States Postal Serv.,* 857 F.2d 1073, 1079 (6th Cir.1988) ("Such a determination should be based upon more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved."). To determine whether Plaintiff was 'otherwise qualified' for the position of patrol deputy, the Court considers whether Plaintiff's qualifications are "at least equivalent to the minimum objective criteria required for employment in the relevant field." *Wexler v. White's Fine Furniture, Inc.,* 317 F.3d 564, 576 (6th Cir. 2003).

In order to serve as patrol deputy, Plaintiff had to graduate from TLETA and successfully complete the field training program. (Doc. No 45 ¶ 3, Spence Depo. at 16-18; Doc. 38-2). Based on deposition testimony, Plaintiff completed ten weeks of FTO training before being assigned to Rutherford County Courthouse Security in September 2014. (Doc. No. 38-1, Ex. 2; Spence Depo.

---

[2] Plaintiff asserts Defendants modified the field training program for Plaintiff and two others to ten weeks, instead of the regular sixteen week. (Doc. No. 45 ¶ 16).

at 24). Three months later, Defendants realized Plaintiff had not completed the requisite training and was not certified to work in the courthouse. (Spence Depo. at 24-26; Grissom Depo. at 16-17; Doc. No. 46-1).[3] Plaintiff was then required to go back into FTO training, but was removed on October 20, 2015, based on the recommendations of his Command Staff. (Doc. No. 38-1, Ex. 8). The Court finds for Plaintiff to be "otherwise qualified" for patrol deputy, Plaintiff had to complete FTO training, which Defendants have determined to be an essential function for patrol deputy.[4] *See Kiphart v. Saturn Corp.*, 251 F.3d 573, 584 (6th Cir. 2001) (finding "[a]job function is essential if its removal would fundamentally alter the position."). The FTO training program requires participants to be exposed to various aspects of duties of being a certified patrol officer (Doc. No. 45 ¶ 15); while Plaintiff requested to work only in the courthouse, a patrol officer needs to be able to properly perform traffic stops and handle domestic assault issues. (*Id.* ¶ 4), *see also* 29 C.F.R. pt. 1630, App. § 1630.2(n) ("The consequences of failing to require the employee to perform the function may be another indicator of whether a particular function is essential. For example, although a firefighter may not regularly have to carry an unconscious adult out of a burning building, the consequence of failing to require the firefighter to be able to perform this function would be serious."). Because Plaintiff did not complete FTO training, an essential job function for patrol deputy, Plaintiff was not otherwise qualified for the position.

---

[3] After reading through the pleadings and depositions, the Court finds no record that Plaintiff completed his FTO training prior to September 2014. The Court also finds no Field Training Program Daily Observation Reports for Plaintiff's first stint at FTO Training.

[4] The Court will not second guess whether Defendants' requirement that courthouse security deputies also be patrol deputies, instead leaving that determination to Defendants. However, Plaintiff provides the Court with no support for the proposition that courthouse security deputies should not also be patrol deputies, other than the differences in the volume of written reports typically prepared by the former. Such a narrow view of the duties of the courthouse security fails to call into question the propriety of Defendants' established and undisputed qualification requirements for its deputies.

2. With or Without a Reasonable Accommodation[5]

Plaintiff proposes several accommodations that he contends would have permitted him to complete FTO training. (Doc. No. 44 at 8). "When the employee seeks a reasonable accommodation, he must establish that a 'reasonable' accommodation is possible, and bears a traditional burden of proof that he is qualified for the position with such reasonable accommodations. If the plaintiff establishes that a reasonable accommodation is possible, the employer bears the burden of proving that such reasonable accommodation would impose an undue hardship." *Hoskins v. Oakland County Sheriff's Dept.*, 227 F.3d 719, 728 (6th Cir. 2000).

Plaintiff asserts he requested three accommodations: (1) extra time to complete reports, (2) assistive technology, and (3) peer or supervisor proofreading of reports, but was only provided the assistive technology. (Doc. No. 44 at 8). Plaintiff argues that his shortcomings in his report writing directly affected his ability to successfully complete road deputy training the second time. (*Id.* at 9). Because Plaintiff's report writing was impacted by his dyslexia, and his disability was not appropriately accommodated, Plaintiff argues he could have qualified for patrol deputy with all reasonable accommodations, instead of just the one accommodation. (*Id.*). Defendants respond that Plaintiff admits that none of his requested accommodations would have helped him complete FTO training, because Plaintiff was removed from the program for reasons that had nothing to do with his dyslexia. (Doc. No. 36 at 10). In support of their position, Defendants rely on the Field Training Program Daily Observation Reports, Firing Range Report, Corporal Mack's Evaluation, and Plaintiff's Patrol Officer/FTO Coordinator Recommendation. (Doc. No. 38-1, Ex. 3-10).

---

[5] Plaintiff also asserts a claim for failure to accommodate under the ADA. (Doc. No. 1, 44). However, the Court will not conduct a separate analysis because the ADA imposes upon employers the duty to make reasonable accommodations for known disabilities, and requires the same *prima facie* elements as ADA discrimination. *See EEOC v Dolgencorp, LLC*, 196 F. Supp. 3d 783, 802 (E. D. Tenn. 2016).

9

Concerning Plaintiff's accommodation, the testimony shows Plaintiff requested his supervisor correct his reports and submit them on his behalf, but this request was denied. (Stephenson Depo. at 12-13; Doc. No. 46-3, Pl. Depo. at 137-140, Doc. No. 38-1).[6] Stephenson stated the request was denied because the officer who was involved in the incident needed to write the report in his own words. (Stephenson Depo. at 12). Plaintiff's request for additional time to write his reports was also denied, because Plaintiff requested for time and a half to complete his report. (Pl. Depo. at 136).[7]

Nonetheless, Plaintiff does not show he was qualified for patrol deputy even with all the requested accommodations. While Plaintiff had issues with writing reports, Plaintiff also had issues with taking initiative (Doc. No. 38-1, Ex. 3), performing traffic stops (*Id.*, Ex. 4), retaining information (*Id.*, Ex. 6), driving safely (*Id.*, Ex. 5, 10), operating his equipment safely (*Id.*, Ex. 7), and multitasking (Spence Depo. at 42-46). Plaintiff's FTO supervisors recommended Plaintiff not be released from the training program because he could not perform the duties of a solo office. (Doc. No. 38-1, Ex. 8, 9, 10). In one report, the supervisor noted that with the assistive technology Plaintiff was taking an unacceptable amount of time to complete his report and had almost caused three motor vehicle accident by not focusing on his surroundings. (*Id.* Ex. 10). Plaintiff also admits that his dyslexia had nothing to with his inability to drive safely or operate his equipment safely, and that none of the accommodations he requested would have made a difference with respect to

---

[6] HR supervisor, Sonya Stephenson ("Stephenson"), stated Plaintiff wanted his supervisor to correct his reports and submit them on his behalf. (Stephenson Depo. at 12). Plaintiff stated he wanted the FTO supervisor to look at his report and then give it back to Plaintiff so he could make corrections before the report was graded by the FTO supervisor. (Pl. Depo. at 138-39).

[7] Stephenson stated that Plaintiff requested a day to complete his reports, and could not accommodate the request because Defendants could not pull Plaintiff off the road for a day to write a report, and at most could give an extra thirty minutes. (Stephenson Depo. at 13).

his ability to operate a firearm or where he placed his hands during a traffic stop. (Doc. No. 45 ¶¶ 45-49).

Accordingly, the Court finds no evidence to support Plaintiff's contention that he is otherwise qualified for patrol officer with a reasonable accommodation, based on Defendants multiple complaints about Plaintiff's FTO training performance that had nothing to do with his dyslexia or his lack of accommodations.

    3. <u>Adverse Employment Action</u>

Plaintiff asserts he suffered an adverse employment action because he was demoted back to jail deputy, which resulted in a 12 percent reduction in pay. (Doc. No. 44 at 10-11). Defendant argues Plaintiff's transfer to deputy jailer was an accommodation for his dyslexia. (Doc. No. 47 at 4). Plaintiff previously worked as a deputy jailer prior to his attempt to become a patrol officer, and it was reasonable and appropriate to offer Plaintiff his previous assignment as a reasonable accommodation. (*Id.* at 5).

An "adverse employment action" is defined as a "materially adverse change in the terms and conditions of employment." *Hollins v. Atl. Co.,* 188 F.3d 652, 662 (6th Cir. 1999). Such a change usually includes "a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.* It "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* "Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Sands v. Jackson State Cmty. Coll.,* 2006 WL 1174469, at *5 (W.D. Tenn. 2006) (citing *Davis v. Town of Lake Park Florida,* 245 F.3d 1232, 1239 (11th Cir. 2001)).

11

The ADA lists "reassignment to a vacant position" as a possible reasonable accommodation mandated by the statute, 42 U.S.C. § 12111(9)(B), and multiple Circuits have held that the ADA requires an employer to consider re-assignment to a vacant position if the disabled employee cannot be reasonable accommodated in his or her current job. *See Cassidy v. Detroit Edison Co.,* 138 F.3d 629, 634 (6th Cir. 1998); *Smith v. Midland Brake, Inc.,* 180 F.3d 1154 (10th Cir. 1999) (en banc); *Feliciano v. Rhode Island,* 160 F.3d 780, 785–86 (1st Cir. 1998); *Aka v. Washington Hosp. Ctr.,* 156 F.3d 1284, 1300–01 (D.C. Cir. 1998) (en banc); *Mengine v. Runyon,* 114 F.3d 415, 418 (3d Cir. 1997); *Gile v. United Airlines, Inc.,* 95 F.3d 492, 498–99 (7th Cir. 1996); *Benson v. Northwest Airlines, Inc.,* 62 F.3d 1108, 1114–15 (8th Cir. 1995). While Plaintiff was working in the courthouse as a patrol deputy, Defendants discovered Plaintiff had not completed training and reassigned Plaintiff to FTO training. (Spence Depo. at 24). Because Plaintiff could not complete training Defendants removed Plaintiff from FTO training and reassigned Plaintiff to jail deputy because he was not a certified patrol officer. (Doc. No. 38-1, Ex. 8, Doc. No. 45 ¶ 27, Doc. No. 48 ¶¶ 30-32). This resulted in Plaintiff receiving a 12 percent reduction in pay. [8] (Doc. No. 48 ¶ 21). The evidence presented shows Plaintiff was reassigned to jail deputy because the position was vacant and he was otherwise qualified for the position due to him working in that position prior to starting FTO training. (Doc. No. 45 ¶ 1). Plaintiff's reassignment back to deputy jailer was an accommodation, not an adverse employment. While Plaintiff received a pay decrease of 12 percent due to the demotion, Plaintiff was not qualified for

---

[8] It is not clear to the Court whether Plaintiff received an increase in pay while in FTO training. However, the Court assumes from the facts presented that Plaintiff received an increase in pay during the time he was assigned to work in the courthouse starting in September 2014, (Doc. No. 38-1, Ex. 2; Doc. No. 48 ¶ 21; Pl. Depo. at 131).

the position of patrol deputy because he did not complete the mandatory FTO training. *See Bratten v. SSI Services, Inc.*, 185 F.3d 625 (6th Cir. 1999).

Finally, Plaintiff claims that although he resigned and was not terminated, he was "constructively discharged." (Doc. No. 44 at 11). Conduct that forces an employee to quit, constituting "constructive discharge," is actionable only if the conduct is motivated by discriminatory intent against a protected employee characteristic. The discriminatory conduct must then make working conditions "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *See Kocsis v. Multi–Care Management, Inc.,* 97 F.3d 867, 887 (6th Cir. 1996). Here, alleged discrimination is not enough to convert an employee's resignation into an actionable constructive discharge. Instead there must be, in addition, aggravating factors, constituting at least a continuous and severe pattern of discriminatory treatment. *Yates v. Avco Corp.*, 819 F.2d 630, 637 (6th Cir. 1987); *Trepka v. Board of Educ.*, 2002 WL 104801, at *6 (6th Cir. 2002). Because the Court has held that Plaintiff cannot establish a genuine issue of material fact as to whether he was discriminated against because of his disability, he is far from establishing the "aggravating factors" necessary for a "constructive discharge" action. *Id.*

The Court finds Plaintiff does not present sufficient evidence to establish a *prima facie* case for ADA discrimination. Therefore, Defendants' summary judgment in regards to Plaintiff's disability discrimination claim is **GRANTED**.

**B. ADA Retaliation**

While Plaintiff's Complaint asserts a claim for ADA retaliation (Doc. No. 1), Plaintiff implicitly abandons this claim by failing to defend or even address this claim in his response brief. *See Carrigan v. Arthur J. Gallagher Risk Management Services, Inc.*, 870 F. Supp. 2d 542, 550

(M.D. Tenn. 2012) (holding that plaintiff abandoned certain claims asserted in his complaint by failing to defend them in his response to defendant's motion for summary judgment). Accordingly, the Court **GRANTS** summary judgment to Defendant on Plaintiff's ADA retaliation claim.

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE